Slip Op. 08-52

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                :
ARCELORMITTAL USA INC.,         :
                                :
                  Plaintiff,    :
                                :
          v.                    :   Before: Richard K. Eaton, Judge
                                :
UNITED STATES,                  :   Court No. 06-00085
                                :
                  Defendant,    :   Public Version
                                :
          and                   :
                                :
DONGBU STEEL CO., LTD., ET AL., :
                                :
                  Def.-Ints.    :
_____ :

[United States Department of Commerce's final results of the eleventh administrative review of the antidumping duty order applicable to corrosion-resistant carbon steel flat products from Korea, sustained.]

Dated: May 15, 2008

*Stewart and Stewart* (*Terence P. Stewart* and *Wesley K. Caine*), for plaintiff.

*Gregory G. Katsas*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Irene H. Chen*), of counsel, for defendant.

*Troutman Sanders LLP* (*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, and *Brady W. Mills*), for defendant-intervenors Union Steel Manufacturing Co., Ltd. and Dongbu Steel Co., Ltd.

*Akin, Gump, Strauss, Hauer & Feld, LLP* (*Spencer S. Griffith*, *J. David Park*, *Jarrod M. Goldfeder*, and *Lisa W. Ross*), for defendant-intervenor POSCO.

Eaton, Judge:  This action is before the court on plaintiff

ArcelorMittal USA Inc.'s Rule 56.2 motion for judgment upon the agency record.[1]  By its motion, plaintiff contests certain aspects of the United States Department of Commerce's ("Commerce" or the "Department") final results of the eleventh administrative review of the antidumping duty order applicable to imports into the United States of corrosion-resistant carbon steel flat products ("CORE") from Korea for the period of review August 1, 2003, through July 31, 2004.  *See* Certain CORE from the Republic of Korea, 71 Fed. Reg. 7,513 (Dep't of Commerce Feb. 13, 2006) (eleventh admin. review), *as amended by* Certain CORE from the Republic of Korea, 71 Fed. Reg. 13,692 (Dep't of Commerce Mar. 20, 2006) (amended final results) (collectively, the "Final Results").  Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2000), and 19 U.S.C. § 1516a(a)(2)(B)(iii).  For the reasons set forth below, Commerce's Final Results are sustained.


BACKGROUND

Plaintiff is a domestic producer of CORE.  *See* Pl.'s Mot. J. Agency R. ("Pl.'s Br.") 4.  On August 19, 1993, following its investigation, Commerce published the antidumping duty order

---

[1]  During the pendency of this action, the court granted plaintiff's consent motion to amend the caption and all filings in this proceeding to reflect its corporate name change, from Mittal Steel USA Inc. to ArcelorMittal USA Inc.  *See* *ArcelorMittal USA Inc. v. United States*, Court No. 06-00085, Jan. 28, 2008 (order).

applicable to imports into the United States of CORE from Korea. *See* Certain CORE From Korea, 58 Fed. Reg. 44,159 (Dep't of Commerce Aug. 19, 1993) (the "CORE Order"). On August 3, 2004, after having conducted ten prior administrative reviews of the CORE Order, Commerce published notice that it would consider requests for the eleventh review. *See* Opportunity to Request Admin. Review, 69 Fed. Reg. 46,496 (Dep't of Commerce Aug. 3, 2004) (notice). Thereafter, on August 31, 2004, plaintiff asked Commerce to conduct a review of the behavior and market activities of certain Korean respondents including Pohang Iron & Steel Co., Ltd. ("POSCO"), Dongbu Steel Co., Ltd. ("Dongbu"), Hyundai HYSCO Co., Ltd. ("HYSCO"), and Union Steel Manufacturing Co., Ltd. ("Union"). The eleventh administrative review was initiated on September 22, 2004. *See* Initiation of Antidumping and Countervailing Duty Admin. Reviews and Request for Revocation in Part, 69 Fed. Reg. 56,745 (Dep't of Commerce Sept. 22, 2004) (notice).

On February 13, 2006, Commerce published its Final Results. *See* Final Results, 71 Fed. Reg. at 7,513. Based on its analysis, the Department assigned imports from POSCO a 2.16 percent dumping margin; those from Union a *de minimis* margin;[2] and those from

---

[2] Under the statute, Commerce is required to "disregard any weighted average dumping margin that is de minimis as defined in section 1673b(b)(3) of this title." 19 U.S.C. § 1673d(a)(4). "[A] weighted average dumping margin is de minimis if [Commerce]
(continued...)

Dongbu a 2.26 percent dumping margin.  *See id.* at 7,514.

Defendant-intervenor HYSCO received a margin of zero.  *See id.*


## STANDARD OF REVIEW

When reviewing a final antidumping determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

In addition, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record

---

[2](...continued)
determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise."  19 U.S.C. § 1673b(b)(3).

supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

## DISCUSSION

Plaintiff's motion presents four issues[3] in challenging Commerce's Final Results. The court is mindful that similar issues were considered in *Mittal Steel USA, Inc. (formerly International Steel Group, Inc.) v. United States*, 31 CIT __, Slip Op. 07-117 (Aug. 1, 2007) ("*Mittal*")[4] (not reported in the

---

[3] An additional issue was resolved by the United States Court of Appeals for the Federal Circuit (the "Federal Circuit") during the pendency of plaintiff's action. Plaintiff argued that "safeguard" duties are "United States import duties" and therefore that Commerce must deduct these duties in order to accurately arrive at appropriate *ex factory* United States prices for comparison with *ex factory* prices for comparable home market sales. *See* Pl.'s Br. 45-47. As *Mittal Steel USA, Inc. (formerly International Steel Group, Inc.) v. United States*, 31 CIT __, Slip Op. 07-117 (Aug. 1, 2007) (not reported in the Federal Supplement), acknowledged, the Federal Circuit recently held, in *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363 (Fed. Cir. 2007), that the phrase "'United States import duties' does not include § 201 safeguard duties for the purposes of determining the [United States price] and calculating the dumping margin . . . ." Therefore, the court again sustains as reasonable Commerce's interpretation of "United States import duties" to exclude Section 201 duties and likewise sustains Commerce's decision to not deduct those duties from United States price. *Id.*

[4] The court's January 28, 2008 order amending the caption
                                                          (continued...)

Federal Supplement), by which the final results of Commerce's tenth administrative review were sustained.  The issues raised by plaintiff's motion are resolved as follows.

I. Model Match

Plaintiff's first claim is that Commerce abused its discretion by failing to request the more detailed product information from Dongbu, HYSCO, POSCO, and Union (collectively, "defendant-intervenors"), that plaintiff believed was necessary for use in Commerce's model match comparisons.  As a result, plaintiff insists that Commerce's model match results were not supported by substantial evidence, because incomplete information "likely yielded inaccurate results."  Pl.'s Br. 2.

Model match criteria are used by Commerce to ensure that the merchandise sold in the United States market is being compared "with a suitable home-market product" for purposes of calculating antidumping duties.  *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995); *see also* 19 U.S.C. § 1677(16)(C)(iii).  In this eleventh review, Commerce used a CORE-specific questionnaire to gather information to identify "identical" merchandise for use in its model match methodology.

---

[4](...continued)
in this matter to reflect plaintiff's corporate name change does not extend to the *Mittal* case, which dealt with the prior, tenth administrative review of the same company.

*See, e.g.*, Letter Dated Nov. 1, 2004 from Commerce to POSCO, and accompanying Request for Information, CORE from Korea (the "Questionnaire"), Public Doc. ("PD") No. 19.  The Questionnaire employed twelve criteria including "width," "thickness," "type," and "quality."  *See* Questionnaire, PD No. 19 at 3-5.  For certain categories of data sought, the Questionnaire asked for information based on ranges of characteristics rather than precise measurements.[5]  *See* Questionnaire, PD No. 19 at 3-5.  "Thus, to identify goods for price comparisons, Commerce would treat as factually 'identical' all CORE within a given range . . . [such that] articles with different actual dimensions could still be treated as 'identical' . . . ."  Pl.'s Br. 5.  Commerce's questions relating to "type" and "quality" also used groupings of characteristics rather than requiring exact product matches.[6]  Questionnaire, PD No. 19 at 3-5.

---

[5]  For instance, Commerce's Questionnaire uses four measurement groups for widths,  "a. >= ½" but <24" b. >=24" but <40" c. >=40" but <60" [and] d. >=60."  Questionnaire, PD No. 19 at 4.  Similarly, it defines "minimum thickness" by employing 11 separate groups as follows: " a. <0.014"; b. >=0.014" but <0.015" c. >=0.015" but <0.016 d. >=0.016" but <0.018" e. >=0.018" but <0.022" f. >=0.022" but <0.028" g. >=0.028" but <0.044"; h. >=0.044" but <0.060" I. >=0.060" but <0.085" j. >=0.085" but <0.130" [and] k. >=0.130"."  Questionnaire, PD No. 19 at 4.

[6]  For "type" Commerce asked defendant-intervenors to indicate, among other things, whether or not the merchandise was painted and, if so, whether the paint was "PVDF" (polyvinyledene flouride) or "all other."  Questionnaire, PD No. 19 at 2.  Further, for "quality," Commerce's questionnaire specified four groups, as well as an "other" response.  The four "quality"
(continued...)

Before Commerce in the tenth administrative review and before this court in *Mittal*, plaintiff made similar arguments by presenting to Commerce a submission employing certain of defendant-intervenors' own price lists.  *See* Pl.'s Br. 7. According to plaintiff, this submission demonstrated that Commerce's model match methodology yielded aberrant results and that this "should have prompted the agency to *at least request* more precise data" such that Commerce and plaintiff "could have pursued the matching issues in greater depth *via* computer analysis."  Pl.'s Br. 26.

In the tenth administrative review, as it has here, Commerce rejected plaintiff's submission and its request to seek more precise information primarily because the price lists submitted by plaintiff did not reflect actual transaction prices.  Further, "several of the price lists cited . . . are exclusive to the Korean respondents' home market and, thus, offer no information

_____

[6](...continued)
groups, in addition to the "other" category, were:

> (a) Commercial, Lock Forming, or Structural;
> (b) Drawing (whether or not special killed);
> (c) Bake Hardened/Dent Resistant; and (d)
> Deep Drawing Steels (e.g., Deep Drawing
> Quality, Deep Drawing Quality Special Killed,
> Extra Deep Drawing Quality, Extra Deep
> Drawing Quality Special Killed, Deep Drawing
> Quality Special Killed Fully Stabilized, Deep
> Drawing Quality Special Killed Fully
> Stabilized, Interstitial Free).

Questionnaire, PD No. 19 at 3.

on how the products are sold in the U.S. market." Pl.'s Br. 8

(quoting Memorandum from Eric. B. Greynolds to Melissa Skinner

Regarding Petitioners' Proposal to Change the Model Match

Methodology (Dep't of Commerce Aug. 27, 2004 (the "Tenth Review

Model Match Memo"), Confidential R. Doc. ("CR") No. 1 at 5-6).

In this eleventh review, Commerce "reaffirmed" its reasoning

from the tenth administrative review and again declined to seek

all of the information requested by plaintiffs. *See* Issues and

Decisions for the Final Results of the Eleventh Administrative

Review of the Antidumping Duty Order on Certain CORE from Korea

(2003 - 2004) (Dep't of Commerce Feb. 6, 2006) (the "I&D Memo"),

PD No. 226 at Comment 1. Before doing so, however, the

Department issued supplemental questionnaires to defendant-

intervenors responsive to certain of plaintiff's requests. *See*

Def.'s Resp. Mot. J. Agency R. ("Def.'s Br.") 3. By these

supplemental questionnaires, Commerce sought additional

information regarding "the physical characteristics of the goods

sold in Korea and in the United States and associated cost of

production information." Def.'s Br. 3 (citations omitted).

Commerce did not, however, "request actual measurement data for

each model sold because such a request 'would have been extremely

burdensome for [defendant-intervenors].'" *See* Def.'s Br. 3

(citations omitted). Thus, although Commerce did obtain more

detailed information, particularly with respect to type, quality,

and cost of production, it did not request all of the data asked for by plaintiff.  *See, e.g.*, Dongbu Suppl. Questionnaire Sections A-D (Dep't of Commerce May 17, 2005), PD No. 117 (requesting information concerning corporate structure, financial statements, distribution process, type, and quality).  In addition, unlike in the tenth review, Dongbu, POSCO, and HYSCO voluntarily submitted additional data reflecting exact widths and thicknesses of the products covered by sales they reported to Commerce.  *See* I&D Memo, PD No. 226 at 4-5; *see also* Pl.'s Br. 11.

Notwithstanding this more detailed information, plaintiff continues to insist that it needs more data so that it can "demonstrate the likely inaccuracy of Commerce's methodology so far as quality and type were concerned."  Pl.'s Br. 11 ("Since no respondent voluntarily submitted more precise 'Type' or 'Quality' information, Mittal was unable to test for those factors.").

Having reviewed the record, the court finds that Commerce made a reasonable decision not to seek all of the information sought by plaintiff.  Here, plaintiff's submission, which purports to demonstrate that Commerce's results were aberrant, relies on the identical price lists it presented in the tenth review.  Unsurprisingly, Commerce again concluded that "the price lists submitted by [plaintiff] contained no evidence indicating that the price lists reflect actual transaction prices, and,

thus, . . . do not necessarily reflect the Korean [defendant-intervenors'] actual sales and pricing practices."  I&D Memo, PD No. 226 at 6.  Commerce further observed that "several of the price lists cited by [plaintiff] were exclusive to the [Korean defendant-intervenors'] home market and offered no information concerning how the products are sold in the United States."[7]  Def.'s Resp. 11.  Thus, for Commerce, this evidence is less reliable and less accurate than the actual sales data it obtained.  *See generally* I&D Memo, PD No. 226 at Comment 1.

With respect to this evidence, the *Mittal* Court found that Commerce was justified in relying upon the actual Unites States sales data it obtained, rather than price lists for merchandise sold in the Korean home market.  *See Mittal*, 31 CIT at __, Slip Op. 07-117 at 11-12.

---

[7]  Commerce's Issues & Decisions Memorandum explains:

> It is important to note that [plaintiff's] arguments and analysis in this review are similar to those submitted in the tenth administrative review.  In particular, our findings with respect to [plaintiff's] arguments on price-list information has already been addressed in our Tenth Review Model-Match Memo . . . As we also found in the tenth administrative review, the price lists submitted by [plaintiff] contained no evidence indicating that the price lists reflect actual transaction prices, and, thus, we found that they do not necessarily reflect the Korean [defendant-intervenors'] actual sales and pricing practices.

I&D Memo, PD No. 226 at 6 (footnotes omitted).

    As to plaintiff's argument that Commerce has not supported its conclusions with substantial evidence because it did not request the additional information plaintiff asked for, Commerce, in fact, had in its possession all of the information needed to make a fair and reasonable product comparison.  That is, Commerce had sufficient information——submitted in response to its initial Questionnaire, the follow-up questionnaires, and voluntarily submitted by defendant-intervenors——about product details such as type, reduction and coating processes, clad material, quality, yield strength, metallic coating weight, width, thickness, form, temper rolling, and leveling.  *See* Questionnaire, PD No. 19 at 3-5.  "Commerce enjoys broad discretion in conducting . . . reviews under the antidumping statute, particularly in . . . [making] decisions regarding relevant evidence."  *See E.I. DuPont de Nemours & Co. v. United States*, 22 CIT 19, 32, Slip Op. 98-7 (Jan. 29, 1998) (not reported in the Federal Supplement); *U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) ("It is the [Department's] task to evaluate the evidence it collects during its investigation."); *but see Ceramica Regiomontana, S.A.*, 10 CIT at 405, 636 F. Supp. at 966 ("Of course, this Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute.").

    Plaintiff, seemingly aware that it cannot demonstrate a

compelling need for Commerce to change its model match methodology, relies on the argument that, if Commerce obtained more information, then perhaps it could demonstrate a compelling need.  This, however, is mere speculation.  While it may be that more information might be useful, plaintiff's submission did not demonstrate that it is necessary.  *See* I&D Memo, PD No. 226 at Comment 1.  Commerce "cannot possibly account for every difference between products . . . ."  *See* Tenth Review Model Match Memo, CR No. 1 at 6.  Therefore, Commerce's decision not to request additional information was a "reasonable means of effectuating the [antidumping law's] statutory purpose . . . ." *Ceramica Regiomontana, S.A.*, 10 CIT at 404–05, 636 F. Supp. at 966.  Accordingly, Commerce's model match results are sustained as supported by substantial evidence.

II.  Constructed Export Price: Deduction of Selling Expenses

As it did in the tenth administrative review, plaintiff argues that Commerce, in calculating constructed export price ("CEP"), acted unlawfully and rendered a determination unsupported by substantial evidence by not deducting certain expenses incurred by the Korean exporter parent companies.[8]  *See*

---

[8]  CEP refers to

> the price at which the subject merchandise is
> first sold (or agreed to be sold) in the
>                                        (continued...)

Pl.'s Br. 22-23, 30-36.  According to plaintiff, when the Korean

parent companies perform "core selling functions[9] in connection

with their U.S. affiliates' resales," Commerce must deduct these

expenses when calculating CEP.[10]  Pl.'s Br. 22-23.  Plaintiff

---

[8](...continued)
        United States before or after the date of
        importation by or for the account of the
        producer or exporter of such merchandise or
        by a seller affiliated with the producer or
        exporter, to a purchaser not affiliated with
        the producer or exporter, as adjusted under
        subsections (c) and (d) of this section.

19 U.S.C. § 1677a(b).  CEP, or United States price, is then
compared to normal value to calculate the dumping margin.  Normal
value is defined as

        the price at which the foreign like product
        is first sold (or, in the absence of a sale,
        offered for sale) for consumption in the
        exporting country, in the usual commercial
        quantities and in the ordinary course of
        trade and, to the extent practicable, at the
        same level of trade as the export price or
        constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

    [9]  Plaintiff makes reference to "core selling functions,"
"core reselling functions," and "core selling expenses," but
these phrases are not defined in the statute or in Commerce's
regulations.  Plaintiff's briefs and its counsel's
representations at oral argument, however, make clear that these
phrases are intended to describe such activities as price
negotiations, entering into sales contracts, and approving
resales, as well as certain travel expenses and information
sharing.  *See* Pl.'s Br. 39; Transcript of Oral Argument at 18-19,
Court No. 06-00085 (Sept. 21 2007).

    [10]  Subsection 1677a(d) provides, in pertinent part:

        [T]he price used to establish [CEP] shall
                                                   (continued...)

[10](...continued)
also be reduced by——

> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)——
>
> > (A) commissions for selling the subject merchandise in the United States;
> >
> > (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
> >
> > (C) any selling expenses that the seller pays on behalf of the purchaser; and
> >
> > (D) any selling expenses not deducted under subparagraph (A), (B), or (C) . . . .

19 U.S.C. § 1677a(d)(1).  Commerce's regulation further provides:

> In establishing [CEP] under section [19 U.S.C. § 1677a(d)(1)], the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid.  The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States,

(continued...)

maintains that "[a]ny other conclusion undermines the concept of 'CEP' as contemplated by the statute and construed by the Federal Circuit."  Pl.'s Br. 22-23.

Plaintiff's motion notes that, while the facts it relies on are company-specific, a "common theme exists" for all of the defendant-intervenors.[11]  Pl.'s Br. 12.  Accordingly, plaintiff

---

[10](...continued)
> although the Secretary may make an adjustment
> to normal value for such expenses under
> section 773(a)(6)(C)(iii) of the Act.

19 CFR § 351.402(b).

[11]  Plaintiff's brief explains its characterization of the facts:

> Basically, parent companies in Korea sell
> CORE to their U.S. subsidiaries, who in turn
> resell the merchandise to unaffiliated U.S.
> buyers in so-called "back to back" CEP
> transactions.  The evidence shows that the
> parent companies participate in varying
> degrees in the subsidiaries' U.S. resales,
> *i.e.*, they effectively perform selling
> functions in the resale operations.
> Oftentimes they perform these activities
> outside the United States - *i.e.*, in Korea --
> and the associated selling expenses appear on
> their own books in Korea.  The location of
> the activities, however, does not change the
> basic fact that the activities and associated
> expenses relate to the U.S. *resale*
> transactions, to be distinguished from the
> sales by the parents *to* the affiliates. . . .
> [Plaintiff] contends that all expenses
> associated with core reselling functions are
> "CEP selling expenses" for purposes of CEP
> calculations under 19 U.S.C. 1677a(d), and
> are therefore deductible as such.  Commerce,
> however, rejected the contention and refused

(continued...)

alleges the following:


A.  Union

Defendant-intervenor Union sold CORE to its American affiliate, which in turn resold the CORE to unrelated United States purchasers in reportable CEP transactions.  Pl.'s Br. 12 (citing Union Sections A-C Questionnaire Resp. ("Union Quest. Resp."), PD No. 59 at 15, 17).  Plaintiff alleges that record evidence demonstrates that Union performed numerous selling functions in the resales, including having final authority to accept or reject orders and shipping the goods directly to purchasers, as well as "process[ing] claims for defective merchandise sold in the U.S. market."  *See* Pl.'s Br. 13 (citing Union Quest. Resp., PD No. 59 at 7, 15).  Plaintiff argues that Commerce, despite inquiring in two supplemental questionnaires about these activities, was wrong in concluding that the record evidence did not demonstrate that these selling expenses should have been deducted in CEP calculations.  *See* Pl.'s Br. 13-14.


B.  POSCO

Defendant-intervenor POSCO had two Korean affiliates that

---

[11](...continued)
>          to deduct the relevant amounts in all cases
>          except for HYSCO.

Pl.'s Br. 12 (citations and footnotes omitted).

sold CORE to its United States affiliate, which then resold the goods to unrelated United States buyers in CEP reportable transactions. *See* Pl.'s Br. 14 (citing POSCO Sections A-D Questionnaire Resp. ("POSCO Quest. Resp."), PD No. 68 at 7-11). Plaintiff alleges that one of POSCO's Korean affiliates negotiated sales terms and that its United States affiliate simply assisted in these negotiations and communications. Pl.'s Br. 14. Furthermore, according to plaintiff, the Korean affiliates performed market research, computer/legal/accounting work, engineering services, and advertising. *See* Pl.'s Br. 14-15 (citing POSCO Quest. Resp., PD No. 68 at 25-28). Plaintiff further alleges that some of these activities *had* to relate to United States resales, not simply sales to POSCO's United States affiliate. Thus, it again argues that Commerce should have concluded that there was substantial evidence on the record demonstrating that these selling expenses should have been deducted in CEP calculations. *See* Pl.'s Br. 15.

### C. Dongbu

Defendant-intervenor Dongbu sold CORE to its United States affiliate which then resold the CORE to United States purchasers in CEP reportable transactions. *See* Pl.'s Br. 15 (citing Dongbu Section A Questionnaire Resp. ("Dongbu Quest. Resp."), PD No. 57 at A-13, A-18). According to plaintiff, Dongbu's United States

affiliate played a self-described "liaison" role.  Plaintiff insists that Commerce did not ask for sufficient information for Commerce to understand the true role of the United States aaffiliate.  *See* Pl.'s Br. 15-16.  Thus, plaintiff asserts that, because Commerce had incomplete information, it is "unclear whether [the Department] ultimately deducted sufficient selling expenses in the CEP calculations."  Pl. Br. 16.

### D.  HYSCO

Plaintiff insists that the record contained evidence that HYSCO performed most of the functions in resales by its United States affiliate.  Thus, plaintiff agrees that Commerce has supported with substantial evidence its decision to include a portion of these selling expenses in its CEP calculations for HYSCO.  *See* Pl.'s Br. 16-17.  For plaintiff, however, "all [defendant-intervenor] parent companies participated in their subsidiaries' U.S. resales, particularly Union and POSCO."  *See* Pl.'s Reply Br. 10.  Therefore, plaintiff characterizes Commerce's treatment of HYSCO as contradictory behavior by the agency.  It maintains that "the government undercuts its own position by the action it took on HYSCO's facts," when it purportedly made similar showings for all defendant-intervenors. *See* Pl.'s Reply Br. 10.

For its part, Commerce maintains that, with respect to three of the defendant-intervenors, it "reasonably determined not to deduct home market indirect selling expenses from [CEP]."  Def.'s Br. 13.  Commerce asserts that the antidumping statute and the statute's legislative history, as well as its "longstanding practice," confirm that a deduction is not warranted for indirect selling expenses that are "general in nature" and "not associated specifically with United States affiliates' resales to unaffiliated customers."  Def.'s Br. 13-14.  The Department further claims that record evidence demonstrates that the expenses cited by plaintiff were general in nature, i.e., attributable to all sales not simply United States resales.  Def.'s Br. 17-18.  For Commerce, plaintiff's arguments are misguided:

> [Plaintiff] asserts that Commerce should have deducted certain expenses incurred by the foreign parent for selling activities like price negotiation because without these activities, the United States sales would not have occurred.  Yet, [plaintiff] fails to recognize the critical distinction, i.e., that these types of expenses are general in nature because they are incurred regardless of whether the sale in question is an export price sale (direct to the unaffiliated United States customer) or a constructed export price sale.  The expenses that Commerce deducts pursuant to 19 CFR § 351.402(b) are only those associated with the additional selling activities that the foreign parent or its United States affiliate must undertake in selling constructed export price subject merchandise to unaffiliated United States customers.

Def.'s Br. 17 (citations omitted).

Additionally, Commerce notes that it made the deduction where warranted, i.e., when "HYSCO had reported that it, not its United States affiliate, performed most of the resale activities in the United States market."  Def.'s Br. 18 (citing I&D Memo, PD No. 226 at Comments 5, 15, and 23).  Therefore, Commerce argues that it "correctly applied the law to the facts" and asks that this court sustain its determinations.  Def.'s Br. 17-18.

A resolution of this dispute revolves around whether Commerce misinterpreted the evidence before it.  The court finds that it did not.  With respect to the deductibility of these expenses, the only material difference between *Mittal* and the present case is the treatment of HYSCO.  Thus, *Mittal* is useful here.  *Mittal* sustained as lawful and supported by substantial evidence Commerce's refusal to deduct expenses it found to be general in nature.  *See Mittal,* 31 CIT at __, Slip Op. 07-117 at 14-16.

Here, as in *Mittal*, there is nothing in the record to indicate that Commerce did not request and receive all of the business information required in order to ascertain the respective levels of involvement of the Korean companies and their United States affiliates in the United States sales.  That is,

> Commerce requested and received from [defendant-intervenors] information regarding

> all business or operational relationships
> affecting the development, product[ion], sale
> or distribution of the subject merchandise in
> the home and United States markets . . . .
> [and] then concluded that [t]he reported
> indirect selling expenses were general in
> nature and not attributable to [CEP] resales
> to unaffiliated United States purchasers.

Def. Br. 17-18; *see also* I&D Memo at Comments 5 (Dongbu), 14 (Union), and 23 (POSCO); I&D Memo at Comment 11 (HYSCO).

Although "plaintiff maintains that the record reveals a substantial level of involvement by the [defendant-intervenors] in the resale of CORE to unaffiliated U.S. purchasers," Commerce disagrees. *See Mittal,* 31 CIT at __, Slip Op. 07-117 at 17; *see also U.S. Steel Group v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) ("It is the [Department's] task to evaluate the evidence it collects during its investigation."). Commerce's position is based upon its assessment of verified information.[12]

---

[12] In this review, Commerce relied on its verifications from the tenth review. In that regard, Commerce verified Dongbu's home-market indirect selling expenses in the tenth review and confirmed that they were unrelated to sales between its United States affiliate and unaffiliated United States buyers. *See* I&D Memo, PD No. 226 at 15. Commerce likewise relied on its verification from the tenth review for Union and POSCO. *See* I&D Memo, PD No. 226 at 28-29, 35. Commerce's reliance on prior verifications was proper. *See* Trade and Tariff Act of 1984, H.R. Rep. 98-725, at 43, reprinted in 1984 U.S.C.C.A.N. 5127, 5170 (1984) ("The Committee . . . believes it is essential to proper enforcement of the laws that information used in determining annually the actual amount of any . . . antidumping duty to be assessed under outstanding orders is accurate to the extent possible. At the same time, the Committee is concerned that requiring verification in every review would result in an unnecessary additional administrative burden on the

(continued...)

Here, "plaintiff has not made a case that the selling functions

performed by the parent companies were mischaracterized by

Commerce."  *Mittal,* 31 CIT at __, Slip Op. 07-117 at 20.[13]  Thus,

_____

[12](...continued)
Department of Commerce for perfunctory verifications.  Therefore,
verification would not be required if an interested party does
not request it in a timely manner, or after recent verifications
have taken place unless shown to be warranted.").

   [13]  *Mittal* discussed Commerce's efforts in collecting and
verifying data:

   . . . verification of Dongbu's questionnaire responses
   revealed:

      [S]ales negotiations begin with Dongbu USA
      [Dongbu's United States affiliate] and the
      U.S. customer.  Dongbu USA informs Dongbu of
      the sales order, then Dongbu inputs the sales
      order into Dongbu's sales system, at which
      time the merchandise is produced to order.
      Company officials stated that Dongbu ships
      directly to the port of the customer's
      request, which is stated in the sales
      contract between Dongbu USA and customer.
      Company officials added that the shipment
      arrangements are made by Dongbu according to
      the terms that are negotiated between the
      customer and Dongbu USA. . . .  Company
      officials also stated that Dongbu USA clears
      the merchandise through Customs and arranges
      for the payments of the customs broker and
      customs duties. . . .  Company officials
      stated that Dongbu USA generally issues the
      invoice to the customer after it has been
      shipped, but before it arrives to the United
      States. . . .  They stated that the customer
      pays Dongbu USA. . . .

   Dongbu Verification Mem. (Dep't of Commerce Feb. 1,
   2005) at 29; *see also id.* at 30 ("We reviewed the list
   of selling activities performed by Dongbu and Dongbu
   USA for each market, and distribution channel.  We also
                                        (continued...)

the court finds that, while plaintiffs and Commerce have a
difference of opinion as to the characterization of the parent
companies' activities, Commerce adequately applied the law to the
facts and has "'articulate[d] a[] rational connection between the
facts found and the choice made.'" *See Mittal,* 31 CIT at __, Slip
Op. 07-117 at 20-21 (quoting *Burlington Truck Lines, Inc. v.
United States*, 371 U.S. 156, 168 (1962)).

Plaintiff's argument that Commerce's decision to deduct
HYSCO's selling expenses (and not other defendant-intervenors'
selling expenses) is somehow demonstrative of Commerce's
contradictory behavior is not convincing.  Commerce is entitled
to treat companies differently if it articulates its reasoning
for doing so and if its conclusions are supported by substantial

---

[13](...continued)
reviewed the list of selling activities and confirmed
with company officials the level of activity in each
market . . . .  We noted no discrepancies.").  The
Department understood this evidence to indicate that
Dongbu's U.S. affiliate, not Dongbu, incurred the
selling expenses resulting from U.S. resales of CORE.
Because "[t]here is no evidence on the record to
suggest [Dongbu's] reported . . . selling expenses are
directly attributable to U.S. sales," Commerce
concluded that these expenses were not deductible from
CEP.  Issues & Decs. Mem. at 10.

Commerce made similar findings with respect to the
level of involvement in resales of CORE to unaffiliated
U.S. purchasers upon verifying Union's, POSCO's and
HYSCO's responses and likewise found the reported
incurred expenses to be unrelated to those sales.

*See Mittal,* 31 CIT at __, Slip Op. 07-117 at 18-19.

evidence.  Here, Commerce agreed with plaintiff that the "record evidence indicates that HYSCO performed most of the functions involved in [its United States affiliates'] resales."  *See* I&D Memo, PD No. 226 at 22 (detailing Commerce's review of HYSCO's selling functions chart and explaining that HYSCO "stated that it negotiated and approved U.S. sales transactions").  Plaintiff has simply not demonstrated that the selling functions performed by the other parent companies were mischaracterized by Commerce.

Based on the foregoing, the court sustains as supported by substantial evidence and according to law Commerce's determination not to deduct selling expenses from CEP because (1) Commerce had all of the necessary information before it; and, (2) the Department reasonably concluded that the defendant-intervenors' reported selling expenses were general in nature and not specifically associated with resales of CORE to unaffiliated purchasers in the United States.

III.  CEP Offset Adjustments

In its investigation, Commerce was required by statute to take into account level of trade ("LOT") differences to account for any price differential resulting from a Korean exporter's sales in Korea being made at a more advanced LOT than its sales to the United States.  *See* 19 U.S.C. § 1677b(a)(7)(A).  Commerce is directed to make an actual LOT adjustment to normal value only

if "the difference in [LOT] . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different [LOTs] in the country in which normal value is determined."  19 U.S.C. § 1677b(a)(7)(A)(ii).

Under 19 U.S.C. § 1677b(a)(7)(B), where the record contains insufficient data to make a LOT adjustment, a CEP offset to normal value calculations may be granted.  *See* 19 U.S.C. § 1677(a)(7)(b).

> When normal value is established at a [LOT]
> which constitutes a more advanced stage of
> distribution than the [LOT] of the [CEP],
> but the data available do not provide an
> appropriate basis to determine under
> subparagraph (A)(ii) a [LOT] adjustment,
> normal value shall be reduced by the amount
> of indirect selling expenses incurred in the
> country in which normal value is determined
> on sales of the foreign like product . . . .

19 U.S.C. § 1677b(a)(7)(B); *see also Mittal*, 31 CIT at __, Slip Op. 07-117 at 24 (citing 19 CFR § 351.412 (f)(3)).[14]

In deciding whether to grant a CEP offset, Commerce will analyze a party's LOT for its home market and for its CEP sales. *See* Def. Br. 20.  "Finding sales to be at a more advanced stage of distribution can be shown by evidence that the foreign producer or exporter performs more selling activities, and thus

---

[14]  This provision provides: "Where available data permit the Secretary to determine under paragraph (d) of this section whether the difference in [LOT] affects price comparability, the Secretary will not grant a [CEP] offset.  In such cases, . . . the Secretary will make a [LOT] adjustment."  19 CFR § 351.412 (f)(3).

incurs more selling expenses, in its home market than it does in the United States." *Mittal*, 31 CIT at __, Slip Op. 07-117 at 25 (citing *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001) ("The effect [of the CEP offset] is to reduce the price of the more advanced [stage of distribution] by 'indirect selling expenses' that have been included in the price on the apparent theory that such costs would not have been incurred if the sale had been made on a less advanced [stage of distribution].")).

Here, Commerce allowed CEP offsets for all defendant-intervenors in the review. It did so based upon information requested and received "relating to channels of distribution, categories of customers, and all selling activities performed and services offered in the United States and foreign markets." Def.'s Br. 5.

> Commerce analyzed the defendant-intervenors'
> selling functions in the United States and
> the Korean markets and determined that sales
> for all four defendant-intervenors involved a
> single level of trade in both the home and
> United States markets, and that the four
> defendant-intervenors' respective [LOT] in
> the United States market were at a less
> advanced stage of distribution than their
> home market [LOT].

Def.'s Br. 6 (internal citations omitted).

Plaintiff maintains that Commerce's analyses and conclusions regarding CEP offsets were improper because Commerce "ignored [plaintiff's] contention that none of the [defendant-intervenors]

had described *all* of the selling activities at the so-called CEP LOT . . . ." Pl.'s Br. 18. That is, plaintiff asserts that the record was incomplete and that Commerce did not have sufficient evidence on the record to "perform fair comparisons of activities at the two respective LOT[s]." Pl.'s Br. 18. "Because Commerce refused to ask questions that would have revealed the selling activities at the so-called CEP [LOT] . . ., it was not possible for Commerce to determine that the parents' sales to their U.S. affiliates were at a less advanced LOT than sales to non-affiliates in the home market." *See* Pl.'s Reply Br. 13; Pl.'s Br. 39. Plaintiff argues that Commerce's failure to remedy these deficiencies in the record demonstrates that the CEP offsets "are unsupported by substantial evidence because no reasonable mind would accept Commerce's analysis of the facts on the basis of the record as made." Pl.'s Br. 18.

Specifically, plaintiff insists that defendant-intervenors provided incomplete information in response to Commerce's initial and supplemental questionnaires requesting information about "*all* the selling functions" at the CEP LOT. Pl.'s Br. 37 (citations omitted). Plaintiff further argues that its comments to Commerce "called attention to [the defendant-intervenors'] failure to show entitlement to the offsets they claimed." Pl.'s Br. 38. According to plaintiff, the defendant-intervenors collectively engaged in a "pattern" of "active[ly] assist[ing] their

affiliates in reselling in the United States," and thereby

promoting their own sales to their affiliates at the CEP LOT.

Pl.'s Br. 38.  Plaintiff asserts that Commerce did not exercise

"common commercial sense" by not inquiring further into these

activities at the CEP LOT, thus failing to perceive "that

affiliates engage in numerous inter-company activities when

performing complementary and overlapping roles in marketing goods

internationally."[15]  Plaintiff further asserts that Commerce's

failure to seek more information about sales made by defendant-

intervenors to their United States affiliates "means that the

record cannot support the agency's determination that home market

sales were made at a LOT 'more advanced' than the CEP LOT, as

judged by a reasonable mind."  Pl.'s Br. 39.  Therefore,

plaintiff seeks a remand to have the record made complete.[16]

---

[15]  According to plaintiff, "[t]hese [activities] include,
among other things, continuing inter-company communications,
coordinate efforts, travel and visits, joint planning,
information sharing, and presumably other activities as well."
Pl.'s Br. 39.

[16]  Plaintiff takes issue with Commerce's explanation
responsive to its observations.  Plaintiff argues that Commerce
gave similar and equally inadequate explanations in granting each
of the defendant-intervenors offsets.  Pl.'s Br. 38-39.
Regarding Union, for example, Commerce wrote:

> Contrary to [plaintiff's] assertions that
> Union's selling activities in the HM [home
> market] via sales intermediaries were not
> significantly different from its CEP sales
> made to its affiliate . . . we find that
> Union provided sufficient information for the

(continued...)

Pl.'s Br. 40.

Notwithstanding plaintiff's arguments, the court finds that Commerce's grant of CEP offsets to defendant-intervenors are supported by substantial evidence. For each defendant-intervenor, Commerce determined that there was sufficient evidence in the record to determine that: (1) each had a single LOT in its home market and a single LOT in the United States market, and (2) their home market sales were at more advanced LOT than their United States CEP sales. *See* I&D Memo, PD No. 226 at Comments 6, 8, 14, 24; *see also* Def.'s Br. 21. Thus, the Department reasonably relied on the extensive information provided by defendant-intervenors concerning their selling functions in the Korean and United States markets in granting each a CEP offset. *See* I&D Memo, PD No. 226 at Comments 6, 8, 14, 24; *see also* Def.'s Br. 21; *Mittal*, 31 CIT __, Slip Op. 07-117 at 19.

Specifically, for Dongbu, Commerce reviewed its

---

[16](...continued)
> Department to compare selling functions and the difference in the degree of selling functions in the two markets. For example, information provided by Union demonstrates that Union's selling functions for the [home market] sales are different and more extensive than those associated with Union's sales to [its affiliate]. Therefore, we conclude that [home market] sales are at a more advanced LOT than its U.S. sales.

Pl.'s Br. 39 (quoting I&D Memo, PD No. 226 at 25).

questionnaire responses and concluded that the same selling

activities occurred in both of its two home market distribution

channels in "comparable frequency" and found "that the two home

market channels of distribution alleged by [Dongbu] constitute

one [LOT]."  Calculation Memo. for Dongbu Steel, Co., Ltd.

("Dongbu Calc. Memo"), CR No. 79 at 2.  Furthermore, Commerce

noted that, "[i]n the U.S. market, Dongbu made only CEP sales

through its U.S. affiliate, Dongbu USA, to unaffiliated customers

in two customer categories, end-users and distributors."  Dongbu

Calc. Memo, CR No. 79 at 2.  Commerce "compared the selling

functions in the home market to the selling functions in the U.S.

market at the CEP LOT, and found a less advanced [LOT] in the

U.S. market."[17]  Dongbu Calc. Memo, CR No. 79 at 2.  Based upon

this selling function analysis, Commerce concluded that Dongbu's

home market sales were "made at a different, and more advanced,

stage of marketing than the LOT of CEP sales."  Commerce,

however, found that it lacked the price data needed to make a LOT

adjustment.  Dongbu Calc. Memo, CR No. 79 at 2.  Therefore,

Commerce reasoned:

> Dongbu did not sell subject merchandise in
> the home market at the same LOT as that of
> the CEP, and there [was] no other data on the

---

[17]  Commerce's Calculation Memorandum for Dongbu indicates
[[

                                      ]]  Dongbu Calc. Memo, CR
No. 79 at 2.

> record that would allow the Department to
> establish whether there is a pattern of
> consistent price differences between sales at
> different [LOTs] in the comparison market.
> Accordingly, while we determined that a LOT
> adjustment may be appropriate for CEP sales .
> . . we are unable to make such an adjustment.
> Instead, we have made a CEP offset to NV
> [normal value] . . . .

Dongbu Calc. Memo, CR No. 79 at 3.

With regard to HYSCO, Commerce undertook a similar analysis and reached the same conclusion, i.e., that "the evidence on the record was sufficient to demonstrate that HYSCO's [home market] sales were at a more advanced LOT than its CEP sales, and that the data available does not provide an appropriate basis to determine an LOT adjustment." *See* I&D Memo, PD No. 226 at 19 (citing Calculation Memo. for Hyundai Hysco (Dep't of Commerce Aug. 31, 2005) ("HYSCO Calc. Memo"), PD No. 181). To reach this conclusion, Commerce reviewed HYSCO's questionnaire responses and selling function charts.[18]  HYSCO Calc. Memo, PD No. 181 at 2.

---

[18]  Commerce's analysis was as follows:

> In the home market, HYSCO sold through one
> channel of distribution to affiliated and
> unaffiliated local distributors and end
> users, and provided the same selling services
> to all customers.

> In the U.S. market, HYSCO made only CEP sales
> through its U.S. affiliate, Hyundai Pipe
> America (HPA), to unaffiliated U.S.
> customers.  According to HYSCO's
> questionnaire response, HYSCO conducted all
> sales and marketing activities in Korea.

(continued...)

Likewise, Commerce undertook the same kind of analysis for Union and reached the conclusion, that Union was entitled to a CEP offset. *See generally* I&D Memo, PD No. 226 at Comment 14. Commerce found that all of Union's Korean sales were made at one LOT, which was more advanced than the LOT of its affiliate's United States sales, and that "it [was] not possible to quantify the extent to which sales at different LOTs in the [home and United States markets] differ in price." *See* I&D Memo, PD No.

---

[18](...continued)
HPA, which did not have a separate sales force for subject merchandise, relayed price and sales information between potential customers and HYSCO, and also received payment from HYSCO's customers on HYSCO's behalf.

. . . HYSCO provided an updated U.S. selling function chart and requested a [LOT] adjustment or CEP offset, stating that HYSCO performed the same functions for its sales to unaffiliated customers, whether in the home market or the United States, and that HYSCO performed very few functions in connection with its sales to HPA.

HYSCO's updated selling function chart . . . indeed shows few selling activities at the CEP [LOT]. Based on our review of the selling functions that are related to CEP and home market sales, we have determined that HYSCO's home market sales are made at a different, and more advanced, stage of marketing than the LOT of the CEP sales . . . . Accordingly, while we have determinated that an LOT adjustment may be appropriate for CEP sales . . . we are unable to make such an adjustment.

HYSCO Calc. Memo, PD No. 81 at 2-3 (citations omitted).

226 at 25.[19]

_____

[19] Commerce's Issues & Decisions Memorandum notes that
Commerce specifically requested that Union demonstrate that its
home market LOT was more advanced that the CEP LOT.  *See* I&D
Memo, PD No. 226 at 25.  Union did so to Commerce's satisfaction.
Commerce's analysis is as follows:

> In the home market, Union sold through three
> channels of distribution to unaffiliated
> local distributors and end-users, and
> provided the same selling services to all
> customers.  Union reported all home market
> sales at the same LOT.  In the home market,
> Unico sold through two channels of
> distribution to local unaffiliated local
> [sic] distributors and end-users.  In the
> U.S. market, Union made only CEP sales
> through its U.S. affiliate, DKA, to
> distributors and end-users.
>
> With respect to sales made by Union and Unico
> in the home-market and the U.S. market, Union
> identified the following selling activities:
> [[
>
>
>                                                   ]]
>
> [W]e asked Union to update . . . the selling
> function chart . . . to account for all
> activities performed by Union in selling
> goods at the CEP LOT.  Union added [[
>                         ]] to the revised
> selling function chart. . . .
>
> . . . [W]e compared the selling functions
> performed for home-market sales with those
> performed with respect to the CEP
> transactions, after deductions for economic
> activities occurring in the United States . .
> .to determine if the home-market [LOT]
> constituted a different [LOT] than the CEP

(continued...)

Commerce again based this conclusion on its review of Union's

questionnaire responses and selling function chart.  *See* I&D

Memo, PD No. 226 at 25.

Commerce reached the same conclusions for POSCO.  It found

that record evidence demonstrated that its home market sales were

at a more advanced LOT than its CEP sales, and granted POSCO a

CEP offset.  *See* I&D Memo, PD No. 226 at 35-36.  Commerce again

did so based upon its review of POSCO's questionnaire responses

and selling chart.[20]  *See* I&D Memo, PD No. 226 at 35-36.

---

[19](...continued)
> [LOT].  We compared the selling functions in
> the home market to the selling functions in
> the U.S. market at the CEP LOT, and found a
> less advanced [LOT] in the U.S. market. . . .
> Union provided [[    ]] or [[  ]] selling
> activities in the U.S. market, as compared to
> the home market for [[                ]]
> selling functions identified . . . .

> . . . Based on our review of the selling
> functions that are related to CEP and home
> market sales, we have determined that Union's
> home market sales are made at a different,
> and more advanced stage of marketing than the
> LOT of the CEP sales.

Calculation Memo. for Union ("Union Calc. Memo"), CR No. 77 at 2
(Dep't of Commerce Aug. 31, 2005).

[20]  Commerce's calculation memorandum details the analysis
it undertook leading to its conclusion that POSCO's home market
LOT was more advanced than its CEP LOT.

> The Department found that the level of [home
> market] selling activities was [[    ]] with
> regard to [[    ]] of the [[        ]]
> selling activities reported for the three

(continued...)

As noted, plaintiff takes issue with Commerce's findings

---

[20](...continued)
channels of distribution (i.e., [[


]]).  For [[     ]] of the
remaining selling activities (i.e.,
[[

]]) associated
with the three channels of distribution, we
found that there was [[  ]] selling activity
reported.  There was         [[         ]]
selling activity reported for  [[  ]] of the
[[         ]] selling activities (i.e., [[post
sale warehousing and technical advice]])
associated with the three channels of
distribution.  Only [[    ]] selling
activities (i.e., [[

]] were not consistently
found among all three channels of
distribution in the home market.  Since the
level of selling activities was generally
consistent among the three channels of
distribution, we found that the home market
channels of distribution constitute one
[LOT].

. . . . We examined the sales to the
affiliated resellers and the selling
functions performed by POSCO or the POSCO
Group on behalf of its affiliate and found
only one [LOT]. [[     ]] of the selling
activities (i.e., [[


]] incurred in the United States
were [[    ]].  The selling activities were
[[       ]] for [[    ]] of the selling
activities (i.e., [[

(continued...)

because it claims that the Department lacked sufficient evidence

to justify the offsets.  Plaintiff claims that there was

incomplete information in the record to demonstrate that

defendant-intervenors' home market sales were made at a more

advanced LOT more advanced than the CEP LOT.  Plaintiff, however,

cites no record evidence to demonstrate that defendant-

intervenors' reporting to Commerce was lacking; rather it relies

upon "common commercial sense."  Commerce, however, is entitled

to at least some deference when gauging the adequacy of the

factual representations made to it.  *See U.S. Steel Group v.*

*United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) ("It is the

[Department's] task to evaluate the evidence it collects during

its investigation.").  Without more, plaintiff's reference to

"common commercial sense" is unavailing.  *See Ceramica*

---

[20](...continued)
                        ]]).

          The CEP [LOT] differed from the home market
          [LOT] with respect to [[    ]] selling
          activities associated with [[


                        ]].  These selling
          activities were [[      ]] for the United
          States, and [[    ]] in at least [[   ]] of
          the channels of distribution in the home
          market.  Therefore, we found that the CEP
          [LOT] differs from the home market [LOT] and
          is at a less advanced stage of distribution
          than the home market [LOT].

Calculation Memo. for POSCO (Dep't of Commerce Aug. 31, 2005)
("POSCO Calc. Memo"), CR Doc. No. 75 at 2-3.

*Regiomontana, S.A.*, 10 CIT at 404–05, 636 F. Supp. at 966 ("As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."). Therefore, "[t]he court cannot . . . credit plaintiff's unsubstantiated assertion that commercial realities render insufficient the evidence Commerce relied upon in making its decision" to grant CEP offsets here. *Mittal*, 31 CIT at __, Slip Op. 07-117 at 31.

Thus, the court finds that in light of Commerce's detailed factual findings, and in accordance with the statutory scheme, Commerce supported with substantial evidence its grant of CEP offsets to the defendant-intervenors. That is, under 19 U.S.C. § 1677b(a)(7)(B), Commerce determined that "the data available [did] not provide an appropriate basis to determine . . . a [LOT] adjustment," and thus Commerce reasonably relied on the evidence of the selling functions performed by defendant-intervenors' United States affiliates in deciding to grant the companies a CEP offset. *See Mittal*, 31 CIT at __, Slip Op. 07-117 at 27-28; *see also Timken Co. v. United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (Fed. Cir 1988) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence

for sufficiency or to reject a finding on grounds of a differing interpretation of the record.") (citations omitted).

Accordingly, the court sustains as being supported by substantial evidence Commerce's grant of CEP offsets to Dongbu, HYSCO, Union, and POSCO.

IV.   Duty Drawback Adjustment

A "[d]rawback is the reimbursement of duties paid on goods imported into the United States and then used in the manufacture or production of articles which are subsequently exported." *Chrysler Motors Corp. v. United States*, 14 CIT 807, 809, 755 F. Supp. 388, 390 (1990); *see also E.I. du Pont de Nemours and Co. v. United States*, 24 CIT 1045, 1046 n.2, 116 F. Supp. 2d 1343, 1345 n.2 (2000). The antidumping statute provides that "[t]he price used to establish . . . [CEP] shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States . . . ." 19 U.S.C. § 1677a(c)(1)(B).

Based on the statute, Commerce has created a two-prong test that must be satisfied prior to the grant of a drawback adjustment. The first prong requires the exporter to establish that "the import duty and rebate are directly linked to, and

dependent upon, one another." *Far East Mach. Co. v. United States*, 12 CIT 972, 974, 699 F. Supp. 309, 311 (1988).  The second prong demands that "the company claiming the adjustment demonstrate that there were sufficient imports of imported raw materials to account for the duty drawback received on the exports of the manufactured product."  *Id.* at 974, 699 F. Supp. at 311.  For over twenty years, Commerce has consistently applied, and this Court has consistently upheld, this test.  *See, e.g., Carlisle Tire & Rubber Co. v. United States*, 11 CIT 168, 171, 657 F. Supp. 1287, 1290 (1987); *Far East Mach. Co.,* 12 CIT at 431–33, 688 F. Supp. at 612; *Hornos Electricos de Venezuela, S.A. v. United States*, 27 CIT 1522, 1525, 285 F. Supp. 2d 1353, 1358 (2003).

Plaintiff argues that Commerce should not have permitted a duty drawback adjustment to the Korean companies' CEP because the Korean drawback system is susceptible to manipulation.[21]  *See*

---

[21]  Plaintiff's brief explains its manipulation argument with the following hypothetical:

> Although unquestionably lawful in Korea, the Korean system makes it possible to manipulate U.S. antidumping results . . . . The following hypothetical scenario can occur.
>
> We can assume that Korean "Producer X" produces only one product, CORE, and that it uses steel scrap as the basic input.  We can further assume that "X" imports 50 percent of its scrap consumption (paying import duties on the same) and obtains the balance locally.

(continued...)

Pl.'s Br. 18-20.  According to plaintiff, Commerce's current method of making drawback adjustments amplifies the potential for distorted dumping margins on Korean products, in part, because "Korean law allows substitution-type drawback, and this allows Korean exporters to pick and choose the export shipments on which they base their drawback claims when they export from Korea." Pl.'s Br. 19-20.  Plaintiff argues that Commerce wrongfully denied its request "to require [defendant-intervenors] to submit certain aggregate data" in order "to test the fairness of their claims."  Pl.'s Br. 20.  According to plaintiff, "[t]his data

---

[21](...continued)
> We can finally assume that "X" sells 50 percent of its total production for export to the United States and 50 percent to Canada. Under these imagined circumstances, in conjunction with the Korean law, "X" could limit its claims for drawback solely to the shipments to the United States while claiming nothing on shipments to Canada - with U.S. antidumping motivations in mind.  As a further hypothetical assumption, we can even assume that "X" could do this even if, as a matter of fact, none of the exports to the United States actually used any imported scrap, but were produced solely from domestic scrap. In circumstances such as these, the result would be a clear distortion so far as U.S. antidumping results are concerned. The claims may be normal and lawful in Korea, but the effect distorts U.S. antidumping calculations in a way that reduces antidumping margins to the disadvantage of U.S. producers. They result in disproportionate upward adjustments to reported United States prices.

Pl.'s Br. 41 (citations omitted).

would have permitted Commerce to analyze whether any [defendant-intervenor] claimed excessive amounts on U.S. sales." Pl.'s Br. 20. Thus, plaintiff maintains that it was foreclosed from pursuing this "theme" of argument before Commerce. Pl.'s Br. 20.

Moreover, plaintiff asserts that Commerce's failure to request further information was an abuse of its discretion, particularly because Commerce itself "has called into question its current methodology for drawback adjustments." Pl.'s Br. 43-44. Plaintiff points the court to a Federal Register notice of June 30, 2005, in which Commerce stated that it "is considering whether changes to its practice, including the two-prong test . . ., may be appropriate." *See* Duty Drawback Practice in Antidumping Proceedings, 70 Fed. Reg. 37,764, 37,765 (Dep't of Commerce June 30, 2005) (notice) (the "First Request for Comments"). This First Request for Comments,[22] according to

---

[22] The First Request for Comments reads in pertinent part:

> The Department is *considering* whether changes to its practice, including the two-prong test . . ., may be appropriate. For instance, some parties have argued that the Department's practice should be modified by requiring a respondent party seeking a duty drawback adjustment to demonstrate payment of import duties on raw material inputs used to produce merchandise sold in the home market. They argue that such a requirement is consistent with principles of price comparability and the implementation of Congressional intent with respect to the duty drawback adjustment. In addition, according

(continued...)

plaintiff, represented an "implicit recognition" that Commerce's

_____

(...continued)
to such parties, any duty drawback adjustment made should also be limited to the amount of duties actually paid on material inputs used to produce merchandise sold in the home market.  Certain parties have also argued that the Department should allocate the total pool of relevant drawback available under some systems to total exports of subject merchandise to ensure that the adjustment claimed on U.S. sales is not overstated.

Parties advocating a change in Department practice argue that in creating the duty drawback adjustment, Congress intended that an increase in the export price resulting from the duty drawback adjustment was designed to offset an increase in the home market price resulting from the payment of import duties on inputs. As a result, the duty drawback adjustment was designed to prevent dumping margins from arising simply because of the rebate (or non-collection) of import duties on the inputs resulting from the export of subject merchandise to the United States. Yet, these parties argue, to permit a drawback adjustment where home market sales do not include import duties leaves nothing for the rebate or exemption to offset.

*In order to fully consider and address these claims* as well as other concerns about the Department's practice regarding duty drawback, the Department is providing an opportunity for the public to comment . . . . The Department is particularly interested in comments relating to questions and possible approaches set forth in the Appendix to this notice, including comments on the consistency with the statute and Congressional intent.

First Request for Comments, 70 Fed. Reg. at 37,765 (internal citations omitted) (emphasis added).

two-prong test may be invalid in particular circumstances and, as such, it is unfair to make plaintiff "wait for the agency to complete is current review to get reconsideration of the drawback adjustments. Pl.'s Br. 44.

Plaintiff further notes that, on October 19, 2006, Commerce published another Federal Register notice that it characterizes as an admission by the Department that its methodology "might change" because it "is subject to manipulation and can be unfair." Pl.'s Reply Br. 14 (citing Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,723-24 (Dep't of Commerce Oct. 19, 2006) (notice) (the "Second Request for Comments")). In its Second Request for Comments, Commerce wrote:

> The Department previously requested and
> received comments regarding its practice with
> respect to duty drawback adjustments to
> export price in antidumping proceedings . . .
> . In past cases, certain parties have argued
> that the Department should allocate the total
> amount of relevant drawback received to total
> exports, regardless of destination, to ensure
> that the adjustment claimed on U.S. sales is
> not overstated.

Second Request for Comments, 71 Fed. Reg. at 61,723 (citation omitted). It then stated:

> The Department *agrees* with these commenters
> and proposes to modify its approach by
> limiting the duty drawback adjustment in
> certain circumstances. *The Department*
> *generally agrees that it should allocate the*

> *total amount of duty drawback received across all exports that may have incorporated the duty-paid input in question, regardless of destination, to ensure that the adjustment claimed on U.S. sales is not overstated.*

*Id.* at 61,723-24 (emphasis added). According to plaintiff, this language constitutes "an outright admission that a change in practice should and will in due course be made." Pl.'s Reply Br. 15. Plaintiff argues that, in circumstances like this, where Commerce has stated that its methodology will change, "there is no basis for the Court to [continue to] defer to Commerce's admittedly flawed precedents." Pl.'s Reply Br. 15. Therefore, plaintiff seeks a remand in order to "receive the benefit [of a change in Commerce's practice] now, not just in future reviews." Pl.'s Br. 44.

The *Mittal* Court upheld Commerce's two-prong test as "a reasonable interpretation of 19 U.S.C. § 1677a(c)(1)(B)" and held that Commerce, in the tenth review, "properly applied the test to the Korean [defendant-intervenors] in this case." 31 CIT at __, Slip Op. 07-117 at 35-36. Here, the court likewise agrees with Commerce that, at this time, there is "no statutory requirement that Commerce" must, as plaintiff suggests, "proportionateley allocat[e] the total duty drawbacks to [defendant-intervenors]' exports to all countries." Def.'s Br. 23; *Mittal*, 31 CIT at __, Slip Op. 07-117 at 36; *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory

interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*.").

Furthermore, the court finds that Commerce properly supported with substantial evidence its decision to make an upward adjustment to CEP in order to account for the drawback defendant-intervenors received from the Korean government on their imports of raw materials. *See Huaiyin Foreign Trade Corp. (30)*, 322 F.3d at 1374 (Fed. Cir. 2003) (citations omitted); Def. Br. 23 (noting that plaintiff "does not contest the substantial record evidence that support's Commerce's determination pursuant to its longstanding, Court-approved practice"). An examination of the evidence reveals that Commerce reasonably concluded that defendant-intervenors satisfied the two-prong test and, thus, were entitled to the CEP adjustment.[23]

The only new argument that plaintiff presses in hopes of distinguishing the instant review from the tenth review (and avoiding the holdings of *Mittal*), is plaintiff's reference to Commerce's two Requests for Comments. Plaintiff's reliance on these requests, however, is misplaced. In the administrative

---

[23] As in *Mittal*, plaintiff's argument concerning margin manipulation essentially seeks to add a third prong to Commerce's two-prong test. That is, plaintiff insists that a third prong "requir[ing] shipment-wide allocation of drawback would eliminate the distortion of dumping margins and maintain the integrity of the antidumping statute." *Mittal*, 31 CIT at __, Slip Op. 07-117 at 35. The court declines plaintiff's invitation to alter Commerce's reasonable interpretation of 19 U.S.C. § 1677a(c)(1)(B).

setting

> two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision-making process, it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations and citations omitted).

The court's acceptance of these notices as binding recognition that Commerce's methodology was invalid or might be invalid would contravene the administrative process and hold the agency to a decision that is not final. This is the case despite Commerce's statement that it "agrees with [the] commenters and proposes to modify its approach." Second Request for Comments, 71 Fed. Reg. at 61,723. Commerce is still "welcom[ing] comment on this *proposed* methodology," *see id.* at 61,724 (emphasis added), and therefore the Second Request for Comment is just that—a call for comments. Thus, Commerce's methodology and its interpretation of 19 U.S.C. § 1677a is entitled to deference until the Department completes its administrative processes. *See Wieland-Werke AG v. United States*, 31 CIT __, __, 525 F. Supp. 2d 1353, 1360 (2007) ("The court must defer to the agency's reasonable interpretation of a statute even if the court might have preferred another.") (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)); *see also Timken Co. v. United*

*States*, 11 CIT 786, 806, 673 F. Supp. 495, 514 (1987); *Moore v. East Cleveland*, 431 U.S. 494, 525 (1977) ("By requiring exhaustion of administrative processes the courts are assured of reviewing only final agency decisions arrived at after considered judgment."). "Commerce's *potential* rulemaking has no effect here." *Rhone-Poulenc, Inc. v. United States*, 20 CIT 573, 584 n. 5, 927 F. Supp. 451, 461 n. 5 (1996) (emphasis added).

Furthermore, while courts have recognized that policy statements may constitute rules, even if they are not promulgated through notice and comment rulemaking, this is not the general practice. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 n. 13 (D.C. Cir. 2000). That is,

> [t]he general consensus is that an agency statement, not issued as a formal regulation, binds the agency only if the agency intended the statement to be binding . . . . The primary consideration in determining the agency's intent is whether the text of the agency statement indicates that it was designed to be binding on the agency.

*Farrell v. Dep't of Interior*, 314 F.3d 584, 590-91 (Fed. Cir. 2002) (citations omitted); *see also Hamlet v. United States*, 63 F.3d 1097, 1103 (Fed. Cir. 1995) ("Obviously, not every piece of paper released by an agency can be considered a regulation entitled to the force and effect of law.").

Here, even a cursory review of the First and Second Requests for Comments reveals that Commerce did not intend them to be binding on the agency or enforceable in this Court. Accordingly,

Commerce's First and Second Requests for Comments do not demonstrate that Commerce erred in refusing to request additional information or otherwise acted improperly in this review by adhering to its established methodology. *See NSK Ltd. v. United States*, 510 F.3d 1375, 1384 (Fed. Cir. 2007) (holding that Commerce's public recommendation to change its methodology was not a final decision where it "has not yet abandoned its previous methodology or adopted a new one").

Based on the foregoing, the court sustains as supported by substantial evidence and otherwise in accordance with law Commerce's duty drawback adjustment to defendant-intervenors' United States price of CORE.


CONCLUSION

Based on the foregoing, the court sustains Commerce's Final Results. Judgment shall be entered accordingly.

                                        /s/Richard K. Eaton
                                          Richard K. Eaton


Dated: May 15, 2008
       New York, New York